# In the United States Court of Federal Claims

Nos. 26-683, 26-684
(Filed under seal: October 9, 2026)
(Reissued: October 28, 2026*)

* * * * * * * * * * * * * * * * * * *

**QTC MEDICAL SERVICES, INC., *et al.*,**

Plaintiffs,

v.

**THE UNITED STATES, *et al.*,**

Defendants.

* * * * * * * * * * * * * * * * * * *

*Sandeep N. Nandivada*, with whom were *Cody B. Fisher*, *Thomas Lee*, *Kevin P. Mullen*, and *James A. Tucker*, Morrison Foerster, LLP, all of Washington, D.C., for Plaintiff LTS Health Partners, LLC.

*Paul F. Khoury*, with whom was *Jonathan C. Clark*, *Tracye W. Howard*, and *W. Benjamin Phillips, III*, Wiley Rein, LLP, all of Washington, D.C., for Plaintiff QTC Medical Services, Inc.

*Augustus Golden*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, with whom were *Steven M. Mager*, Assistant Director, *Patricia M. McCarthy*, Director, *Douglas K. Mickle*, Deputy Director, and *Brett A. Shumate*, Assistant Attorney General, all of Washington, D.C., for Defendant, and *Jason R. Smith*, Associate General Counsel, *Erik A. Troff*, Associate General Counsel, and *Matthew Vazquez*, Associate General Counsel, Office of General Counsel, Defense Health Agency, of Falls Church, VA, of counsel.

*Daniel Forman*, with whom were *James G. Peyster* and *Isaac D. Schabes*, Crowell & Moring, LLP, all of Washington, D.C., for Defendant-Intervenor.

---

* Pursuant to the protective order entered in this case, this opinion was filed initially under seal. The parties provided proposed redactions of confidential or proprietary information, which are redacted in this version of the opinion. In addition, the Court made minor typographical and stylistic corrections to this version of the opinion.

## OPINION AND ORDER

**SOMERS,** Judge.

This Court has observed that "any good lawyer can pick lint off any Government procurement." *Dev Tech. Grp., Inc. v. United States*, 179 Fed. Cl. 361, 377 (2025) (cleaned up) (quoting *Ginn Grp., Inc. v. United States*, 159 Fed. Cl. 593, 608 (2022)). Thus, to succeed in a bid protest, counsel should not strive to point out as many minor errors with a procurement as he or she can. Instead, a successful bid protest requires a protestor to show that the agency's error has "some significance.'" *Andersen Consulting v. United States*, 959 F.2d 929, 932 (Fed. Cir. 1992) (quoting *Andersen Consulting*, GSBCA No. 10833–P, 91–1 BCA ¶ 117,759).

In this protest, LTS Health Partners, LLC ("LHP") and QTC Medical Services, Inc. ("LQTC") (collectively "Plaintiffs") ignored this basic principle. Deploying a total of seventeen arguments across approximately 150 pages of briefing, Plaintiffs have done their best impression of a lint roller, attempting to pick every particle off this procurement. But the Administrative Procedure Act ("APA") standard applicable here does not require the Court to set aside a contract award for minor defects in the procurement process. Nor is it a standard that can be met with minimally developed arguments. Rather, the APA standard is an exacting one when it comes to overruling agency actions. As discussed further below, only arguments that show that the "agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise'" meet the standard. *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Moreover, even if a protestor meets the burden of showing error, it must then show that the error was prejudicial by demonstrating that it had a "substantial chance it would have received the contract award but for the alleged error in the procurement process." *REV, LLC v. United States*, 91 F.4th 1156, 1163 (Fed. Cir. 2024) (cleaned up) (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)). Both Plaintiffs fall far short of this standard.

Plaintiffs' "kitchen sink" approach to briefing—where Plaintiffs appeared to throw every argument they could think of at the Court to see what would stick—leaves even their strongest arguments lacking. As the Court has recently warned protestors, "weak arguments do not just fail on their own merits—they often weaken stronger ones." *Scale AI, Inc. v. United States*, 182 Fed. Cl. 524, 530 (2026). Plaintiffs' approach to this protest requires the Court to once again climb onto its soapbox to repeat that reminder. Throughout the briefing on Plaintiffs' motions for judgment on the administrative record ("MJARs"), the Court encountered arguments that were undeveloped, incomplete, or wholly meaningless. The Court's observations about this "scattershot" advocacy were confirmed at oral argument, where the Court limited Plaintiffs to the three arguments that each Plaintiff thought were its strongest. Oral Argument Recording at 1:37. *Neither LHP nor LQTC reached three arguments*. Perhaps the parties may have been better served in developing the points they raised at oral argument, rather than volleying as many arguments in forty pages as they could. Alas, Plaintiffs spent too much time and effort on seemingly weak arguments, which rendered their strongest arguments undeveloped and

insufficient. *See Howard v. Gramley*, 225 F.3d 784, 791 (7th Cir. 2000) (noting this approach risks consuming "space that should be devoted to developing the arguments with some promise . . . ."). Accordingly, for the reasons set forth below, the Court declines to disturb the Defense Health Agency's ("DHA") award decision.

## BACKGROUND

This bid protest arises from the award of DHA's Remote Health Readiness Program ("RHRP") procurement. *See* ECF No. 40-1 at 4. Through the RHRP program, the Agency provides medical, dental, and behavior health services to various components of the active-duty military, the military reserves, Department of War Service Civilians, and members of the Department of Homeland Security. Tab 31a at AR 335. This procurement is the fourth iteration of the RHRP program, known as RHRP-4. *Id.* at AR 338. DHA received four timely initial proposals in response to the RHRP-4 solicitation from LHP; LQTC, the incumbent on the predecessor RHRP-3 contract; [redacted]; and OptumServe Health Services, Inc. ("Optum"), which held the RHRP-2 and RHRP-2 bridge contract. Tab 178 at AR 3724; ECF No. 42-2 at 2. DHA awarded the RHRP-4 contract to Optum, prompting LHP and LQTC to protest the procurement. *See generally* ECF No. 1; ECF No. 44 (complaints). The Court recites below the facts relevant to resolution of the parties' cross-motions for judgment on the administrative record.

### A. The Solicitation

On February 20, 2025, the DHA issued the RHRP-4 Solicitation, Solicitation No. HT001125R0020 (the "Solicitation" or "RFP"). Tab No. 31a at AR 333. The Solicitation was for a best value procurement, in which the Agency awards a bid to an offer that represents the best value to the Agency based on a "trade-off analysis among the price, technical/risk, and past performance factors." Tab 33.4 at AR 818.

The RFP listed five factors for evaluation: Factor 1, "Small Business Participation Plan"; Factor 2, "Key Personnel Qualifications"; Factor 3, "Technical/Risk"; Factor 4, "Past Performance"; and Factor 5, "Price." *Id.* at AR 819. Factors 1 and 2 were to be evaluated on an Acceptable/Unacceptable basis and would not factor in the best value tradeoff process. *Id.* In other words, Factors 3–5 would be included in the tradeoff and are the relevant factors in LHP's and QTC's bid protests. Factor 3 was more important than Factor 4 and Factor 4 was more important than Factor 5. *Id.* The non-Price evaluation factors (Factors 3 and 4), when combined, were more important than Price (Factor 5). *Id.* Having conducted a tradeoff analysis, the Agency would award the contract to the offeror whose proposal (1) was found Acceptable under both the Small Business Participation plan and Key Personnel factors, and (2) was most advantageous to the Agency based on the tradeoff of Factors 3–5. *Id.*

For the Small Business Participation factor (Factor 1), the Government would consider how an offeror's proposed Small Business Participation Commitment Document compared with the "small business goals listed" in the Solicitation; the extent to which the offeror identified potential small business partners in its commitment document; and "the extent to which the document" explained the "good faith efforts" the offeror would "make to meet the specified

goals" to the "maximum extent practicable." *Id.* at AR 819–20. For Factor 2, DHA would evaluate each "[o]fferor's proposed Key Personnel to ensure they possessed the minimum qualifications described" in the pertinent performance work statement ("PWS") paragraphs. *Id.* at AR 820. All offerors met these standards. Tab 183 at AR 4005.

Factor 3 (Technical/Risk) required the Agency to evaluate "the quality of the Offeror's technical solution for meeting the Government's requirement and the extent to which the Offeror clearly understands the Government's requirements . . . ." Tab 33.4 at AR 821. The Technical/Risk factor was divided into five equally weighted subfactors: Subfactor 1, "Provider Network"; Subfactor 2, "Scheduling Capability"; Subfactor 3, "NIST/CMMC Compliance"; Subfactor 4, "Transition-In Plan"; and Subfactor 5, "Scenarios." *Id.* at AR 819. The Agency evaluated each of the subfactors to determine whether an offeror's proposal included strengths, deficiencies, or weaknesses. *Id.* at AR 821. A "significant strength" would be an "aspect of an Offeror's proposal with *appreciable* merit or that will *exceed* specified performance or capability requirements to the *considerable advantage* of the Government . . . ." *Id.* A "strength" would have "*merit* or *exceed*[] specified performance or capability requirements in a way that will be *advantageous* to the Government . . . ." *Id.* On the other hand, a "deficiency" would be a "*material failure*" to "meet a Government requirement or a *combination of significant weaknesses* in a proposal that *increases the risk* of unsuccessful contract performance to an unacceptable level." *Id.* Further, a "weakness" would be a "*flaw* in the proposal that *increases the risk* of unsuccessful contract performance," and a "significant weakness" would be a "*flaw* that *appreciably* increases the risk of unsuccessful contract performance. *Id.*

Under Factor 3, DHA would conduct two distinct evaluations: a technical evaluation and a risk evaluation. *Id.* at AR 821–22. DHA would analyze each of the five subfactors under both the technical and risk evaluation, then assign an overall technical rating and an overall risk rating. *Id.* DHA would assign one of the following ratings under the technical evaluation:

| Rating | Description |
|---|---|
| **Outstanding** | Proposal demonstrates an exceptional approach and understanding of the requirements and contains multiple strengths and/or at least one significant strength. |
| **Good** | Proposal demonstrates a thorough approach and understanding of the requirements and contains at least one strength or significant strength. |
| **Acceptable** | Proposal demonstrates an adequate approach and understanding of the requirements. |
| **Marginal** | Proposal has not demonstrated an adequate approach and understanding of the requirements. |
| **Unacceptable** | Proposal does not meet requirements of the solicitation and, thus, contains one or more deficiencies and is un-awardable. |

*Id.* at AR 821. The risk evaluation would assess "the degree to which an offeror's proposed approach to achieving the technical factor or subfactor may involve risk of disruption of

schedule, increased cost or degradation of performance, the need for increased Government oversight, and the likelihood of unsuccessful contract performance." *Id.* at AR 822. In doing so, the government would evaluate "the Offeror's proposed approach, method, or process for completing tasks and the Offeror's demonstrated experience in performing tasks (including experience in performing a proposed approach, method, or process)." *Id.* For the risk component, the DHA would assign one of the following ratings:

| Rating | Description |
|---|---|
| Low | Proposal may contain weakness/weaknesses which have low potential to cause disruption of schedule, increased cost, or degradation of performance. Normal contractor emphasis and normal Government monitoring will likely be able to overcome any difficulties. |
| Moderate | Proposal contains a significant weakness or combination of weaknesses which may have a moderate potential to cause disruption of schedule, increased cost, or degradation of performance. Special contractor emphasis and close Government monitoring will likely be able to overcome any difficulties. |
| High | Proposal contains a significant weakness or combination of weaknesses which may have a high potential to cause significant disruption of schedule, increased cost, or degradation of performance. Special contractor emphasis and close Government monitoring will unlikely be able to overcome any difficulties. |
| Unacceptable | Proposal contains a deficiency or combination of significant weaknesses that causes an unacceptable level of risk of unsuccessful performance. |

*Id.*

DHA would evaluate Factor 4 (Past Performance) by assessing the "Offeror's probability of meeting the solicitation's requirements based on an Offeror's demonstrated record of recent and relevant work performance." *Id.* at AR 825. Under this factor, DHA would evaluate an offeror's past performance using "no more than five (5) recent and relevant past performance references provided by the Offeror . . . ." *Id.* DHA would consider "the Offeror's past performance proposal, past performance questionnaires, and any additional information the agency obtained from the offeror's customers listed in the proposal." *Id.* The agency could also, "at its sole discretion, use relevant past performance information from other [sources]." *Id.* DHA would evaluate the Recency and Relevancy of each past performance effort submitted by an offeror. *Id.* at AR 825–26. For those references found to be recent and relevant, DHA would also consider the quality of performance on those references. *Id.* at AR 827.

"To be considered recent, the performance or contract completion date on the past performance reference would be within five (5) years of [the] RFP's release date." *Id.* at AR

825. Relevance would be based on the "scope and magnitude of effort and complexities of the work performed under [each] contract reference as it relates to the requirements of [the Solicitation]." *Id.* at 826. DHA would assess a reference's relevance "based on those functions the Offeror or its major subcontractor"[1] would perform on the RHRP-4 contract. *Id.* "More recent and relevant past performance [would] typically be a stronger predictor of future success and have more influence on the past performance confidence assessment than past performance of lesser relevance." *Id.* If the Agency were to receive "adverse past performance information, then [it could] gather further information about the circumstances surrounding the situation" and "consider the number and severity of the problem(s), mitigating circumstances, and the effectiveness of corrective actions that have resulted in sustained improvements." *Id.* at 825. It would only consider "process changes" when the offeror showed "objectively measurable improvements in performance . . . ," *Id.*

The Solicitation included a non-exhaustive table of "Relevancy Evaluation Considerations" to "provide[] clarity on how the Government defines the RHRP-4 contract scope, magnitude, and complexity for comparison . . . ." *Id.* at AR 826.

| | |
|---|---|
| Scope<br>(PWS para 1.3, 1.4) | Provides all types of medical and dental readiness services |
| Magnitude<br>(PWS para 1.2, 1.3) | 1. Total contract cost >$125M per year<br>2. Services in 50 States and the District of Columbia, the Commonwealths of Puerto Rico and the Northern Mariana Islands, the territories of American Samoa, Guam, and the U.S. Virgin Islands |
| Complexity<br>(PWS para 1.9, 5.1, 5.2.6, 5.2.7, 5.3, 5.5, 5.7.8) | The following tasks are to be performed under RHRP-4 requirements:<br>1. Shipping/Storage Distribution Networks (Logistics)<br>2. Support in-person, large-scale group readiness events<br>3. Establish and maintain provider networks<br>4. Provide Virtual Health Services<br>5. Provide Telephonic and Electronic Scheduling |

*Id.* Each Recent past performance reference then received a Relevance rating:

[1] A subcontractor that performs greater than 25 percent of the work. Tab 31a at 436.

| Rating | Description |
| --- | --- |
| Very Relevant | Present/past performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires. |
| Relevant | Present/past performance effort involved similar scope and magnitude of effort and complexities this solicitation requires. |
| Somewhat Relevant | Present/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires. |
| Not Relevant | Present/past performance effort involved little or none of the scope and magnitude of effort and complexities this solicitation requires. |

*Id.* at AR 827.

Then, after DHA assigned a relevancy rating to a reference, it would determine the quality of the offeror's performance. *Id.* However, DHA would not assign a separate quality assessment rating. *Id.* Next, DHA would assess a performance confidence rating regarding "the Offeror's ability to successfully perform the requirements of the solicitation . . . ." *Id.* This assessment would be based on both relevancy and quality of the offeror's past performance. *See id.* The available Confidence ratings for Past Performance were:

| Rating | Description |
| --- | --- |
| Substantial Confidence | Based on the offeror's recent/relevant performance record, the Government has a high expectation that the offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the offeror's recent/relevant performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort. |
| Neutral Confidence | No recent/relevant performance record is available, or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. The offeror may not be evaluated favorably or unfavorably on the factor of past performance. |
| Limited Confidence | Based on the offeror's recent/relevant performance record, the Government has a low expectation that the offeror will successfully perform the required effort. |
| No Confidence | Based on the offeror's recent/relevant performance record, the Government has no expectation that the offeror will be able to successfully perform the required effort. |

*Id.* at AR 827–28.

Under Factor 5 (Price), DHA would evaluate each offeror's total evaluated price ("TEP") for reasonableness, completeness, and balance to determine best value. *Id.* at AR 828. A price would be considered reasonable if "in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business." *Id.* The solicitation expressly stated that DHA would not conduct any price realism analysis. *Id.*

**B. Proposal Evaluation**

On May 8, 2025, DHA received four timely initial proposals in response to the solicitation from LQTC, LHP, [redacted], and Optum. Tab 178 at AR 3724. On August 20, 2025, following the initial evaluation of proposals, the contracting officer ("CO") and source selection authority ("SSA") established a competitive range consisting of all four offerors. Tab 179 at AR 3778, 3793.

DHA then engaged in discussions with each of the four offerors. After sending the offerors notices of their inclusion in the competitive range and their respective discussion questions in the form of evaluation notices ("ENs"), the CO met with each offeror on August 22, 2025. *See* Tab 183 at AR 4004. After receiving responses from all offerors to the ENs, the SSA concurred with the CO's recommendations to close discussions. *Id.*

On September 9, 2025, DHA sent letters to offerors notifying them that discussions had closed and requesting final proposal revisions ("FPRs"). *Id.* After sending the requests for FPRs, the CO called LHP and LQTC. *See* ECF No. 40-1 at 7; Tab 201 at AR 4707. During her call to LQTC, the CO advised LQTC that its TEP was "slightly higher." Tab 201 at AR 4707. When LQTC requested clarification, the CO responded, "[s]lightly higher than the independent estimate." *Id.* During her call to LHP, the CO advised LHP that its TEP was "slightly above average." ECF No. 40-1 at 7; ECF No. 38-2 at 1.

The offerors submitted their FPRs on September 15, 2025. Tab 183 at 4004. The offerors' proposed technical approaches were evaluated by DHA's technical evaluation team ("TET"). *See generally* Tabs 268–71 (TET reports). The offerors' past performance submissions were evaluated by DHA's past performance evaluation team ("PPET"). *See generally* Tabs 272, 284, 305, 317 (PPET reports). The offerors' TEPs were evaluated by DHA's price evaluation team ("PET"). *See generally* Tab 263 (PET report). The chair of the source selection evaluation board ("SSEB") reviewed the reports of the TET, PPET, and PET, and compiled them in a final proposal evaluation report. *See generally* Tab 181 (proposal evaluation report).

The source selection advisory council ("SSAC") provided the SSA with a written comparative analysis of the final proposals submitted by the offerors and a recommendation as to which proposal represented the best value to the Government. Tab 182 at AR 3958. In performing its comparative analysis, the SSAC reviewed the evaluation results, the SSEB report, and the proposals, as necessary. *Id.*

The SSAC recommended that the SSA select LQTC for award. *Id.* at AR 4001. The SSAC report included dissenting opinions from two SSAC members on two points. First, the dissent assessed that Optum's proposal was superior to LQTC's proposal under Factor 4 (Past

Performance), contrary to the SSAC's determination that the two were equal. *Id.* at AR 3995. Second, the dissent recommended that Optum, not LQTC, be selected for the award. *Id.* at AR 4001.

The SSA reviewed the evaluation teams' and SSAC's recommendations and assigned his own ratings to the offerors. Tab 183 at AR 4003, 4006. The SSA noted that where he "concurred and [had] not taken exception with particular evaluation findings [he]accept[ed] these findings, conclusions, and the supporting rationale as [his] own and incorporate[d] them into [the] decision document." *Id.* at AR 4005. Ultimately, the SSA adopted many of the SSAC's recommendations.

However, the SSA differed from the SSAC in two areas relevant for this protest. First, he adopted the dissenting opinion of the SSAC that the appropriate overall confidence rating for LQTC's past performance was Satisfactory Confidence, not Substantial Confidence. *Id.* at AR 4023–24. He noted that LQTC's performance on RHRP-3, the precursor to RHRP-4, had warranted three letters of concern ("LOCs") in the 2022-23 timeframe followed by a cure notice in 2024. *Id.* at AR 4022. The SSA further explained that the SSAC majority found that LQTC "responded appropriately to the series of letters of concern and the Cure Notice . . . by correcting deficiencies and otherwise improving its performance significantly . . . ." *Id.* In the end, the SSA "carefully review[ed] LQTC's entire past performance record . . . ." *Id.* at AR 4023. Having done so, the SSA concurred with the minority's conclusion and assigned LQTC a Satisfactory Confidence rating. *Id.* at AR 4023–24.

Second, the SSA disagreed with the overall past performance rating of Limited Confidence for LHP. He noted that "LHP's record of relevant past performance, outside of the dental provider network arena, is quite limited," and that "the quality of work reflected in LHP's two relevant non-dental references" did not reflect high ratings or was very sparse. *Id.* at AR 4026. But he assessed that "nothing in LHP's past performance suggests that their performance was ever substandard." *Id.* Therefore, the SSA concluded that LHP's past performance record "is so sparse that no meaningful confidence assessment rating can be reasonably assigned" and gave LHP a Neutral Confidence rating on Factor 4. *Id.*

The SSA's final ratings are as follows:

| Factor 3: Technical/Risk Ratings | LQTC | Optum | [redacted] | LHP |
|---|---|---|---|---|
| Subfactor 1 - Provider Networks | Good<br>2 Strengths<br>0 Weaknesses | Good<br>2 Strengths<br>0 Weaknesses | Acceptable<br>2 Strengths<br>1 Weakness | Good<br>4 Strengths<br>0 Weaknesses |
| Technical Risk Rating: | Low | Low | Low | Low |
| Subfactor 2 - Scheduling Capability | Acceptable<br>0 Strengths<br>0 Weaknesses | Good<br>1 Strength<br>0 Weaknesses | Acceptable<br>0 Strengths<br>0 Weaknesses | Good<br>3 Strengths<br>0 Weaknesses |
| Technical Risk Rating: | Low | Low | Low | Low |
| Subfactor 3 - NIST/CMMC Compliance | Acceptable<br>1 Strength<br>0 Weaknesses | Acceptable<br>0 Strengths<br>0 Weaknesses | Acceptable<br>1 Strength<br>0 Weaknesses | Good<br>3 Strengths<br>0 Weaknesses |
| Technical Risk Rating: | Low | Low | Low | Low |
| Subfactor 4: Transition-In Plan | Good<br>1 Strength<br>0 Weaknesses | Good<br>3 Strengths<br>0 Weaknesses | Good<br>2 Strengths<br>0 Weaknesses | Acceptable<br>1 Strength<br>0 Weaknesses |
| Technical Risk Rating: | Low | Low | Low | Low |
| Subfactor 5: Scenarios | Good<br>2 Strengths<br>0 Weaknesses | Acceptable<br>1 Strength<br>0 Weaknesses | Acceptable<br>1 Strength<br>0 Weaknesses | Acceptable<br>0 Strengths<br>0 Weaknesses |
| Technical Risk Rating: | Low | Low | Low | Low |
| Overall Technical/Risk Rating: | Good/Low<br>6 Strengths<br>0 Weaknesses | Good/Low<br>7 Strengths<br>0 Weaknesses | Acceptable/Low<br>6 Strengths<br>1 Weakness | Good/Low<br>11 Strengths<br>0 Weaknesses |
| Factor 4 – Past Performance | | | | |
| Past Performance Confidence Assessment | Satisfactory Confidence | Substantial Confidence | Neutral Confidence | Neutral Confidence |
| Factor 5 – Price | | | | |
| Total Evaluated Price (TEP) (does not include Travel/Shipping CLIN or Transition-In CLIN) | $1,032,705,141.73 | $1,068,444,680.13 | $1,213,541,299.79 | $1,281,945,250.67 |

*Id.* at AR 4006.

The SSA determined that LHP's proposal was the best under Factor 3, followed by Optum, then LQTC, then [redacted]. *Id.* at AR 4038. Optum's proposal was the best under Factor 4, followed by LQTC, then by LHP and [redacted] as "essentially equal." *Id.* at AR 4040. Finally, LQTC offered the most favorable price, followed by Optum, then [redacted], then LHP. *Id.* at AR 4041.

The SSA then engaged in a trade-off analysis by first comparing the offerors with the highest ratings under the most important evaluation factor (Technical/Risk)—LHP and Optum. *Id.* at AR 4041–42. The SSA explained that he did not consider LHP's "clear but modest advantage over Optum" under this factor to be enough "to overcome Optum's considerable advantage in past performance" or enough "to pay a $213M (or 20 percent) price premium." *Id.* at AR 4041–42. The SSA further explained that Optum's superiority under the past performance factor "erases the value of any advantage LHP had over Optum under the most important Technical/Risk factor." *Id.* at 4042.

In comparing Optum's proposal to LQTC's, the SSA found that "[t]aken together, Optum's slight advantage under the Technical/Risk factor and substantial advantage under the Past Performance factor outweigh the 3 percent price advantage offered by LQTC . . . ." *Id.* at AR 4044. The SSA further noted that even if he had found that Optum and LQTC were equal under the Technical/Risk factor, Optum's advantage under the Past Performance factor, by itself, would still outweigh the "price advantage/volume discount advantage offered by LQTC." *Id.* Thus, the SSA assessed that Optum's proposal provided the best value to the Government and awarded the contract to Optum. *Id.*

### C. Procedural History

On May 8, 2026, LQTC and LHP each filed a protest in this Court. *See generally* ECF No. 1; ECF No. 44 (operative complaints). The Court consolidated the cases and granted Optum's Motion to Intervene on May 13, 2026. *See* ECF No. 17 (Consolidation Order in 26-684); ECF No. 19 (Order granting Motion to Intervene in 26-683). LQTC and LHP each filed a MJAR on June 10, 2026. *See generally* ECF No. 40; ECF No. 42 (MJARs). Optum and the government each filed a cross-MJAR on July 10, 2026. *See generally* ECF No. 52; ECF No. 54 (cross-MJARs). The Court heard oral argument on Plaintiffs' MJARs and Optum's and the government's cross-MJARs on September 2, 2026. These motions are now ripe for review.

## DISCUSSION

### A. Legal Standard

The Tucker Act, as amended by the Administrative Dispute Resolution Act, provides the Court of Federal Claims with jurisdiction over any "action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). In exercising its bid protest jurisdiction, the Court "review[s] the agency's decision pursuant to the standards set forth in section 706 of title 5," *id.* § 1491(b)(4), which requires the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). "To succeed in a bid protest, a protestor must make two showings. First, a protestor must show error, meaning that the agency violated the APA standard. Second, a protestor must demonstrate that such error was prejudicial." *Dev Tech.*, 179 Fed. Cl. at 369 (first citing *Bannum, Inc. v. United States*, 404 F.3d

1346, 1351 (Fed. Cir. 2005), then citing *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996)).

To demonstrate that an agency's actions were in error, a protestor must establish that the agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft*, 586 F.3d at 1375 (alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43). Accordingly, a procurement decision may be set aside if the protestor proves that "'(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (quoting *PGBA, LLC v. United States*, 389 F.3d 1219, 1225 n.4 (Fed. Cir. 2004)).

But error alone is not enough; the error must also be prejudicial to the protestor for the Court to set aside an award. *See, e.g.*, *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 908 (Fed. Cir. 2013) ("Ultimately, to prevail in a bid protest, the protestor must show prejudicial error."). "[T]here is no presumption of prejudice when a protestor demonstrates irrationality in an agency decision." *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021). To establish prejudice, a protestor "must show that there was a substantial chance it would have received the contract award but for the alleged error in the procurement process." *REV, LLC*, 91 F.4th at 1163 (internal citations and quotations omitted). To show it had a substantial chance to receive the contract, the protestor must show "that it is a qualified bidder and could compete for the contract." *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1360 (Fed. Cir. 2015) (emphasis omitted). Stated differently, "the protestor's chance of securing the award must not have been insubstantial." *Info. Tech.*, 316 F.3d at 1319.

Bid protests are generally decided on cross-motions for judgment on the administrative record under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). RCFC 52.1 requires the Court to "make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum*, 404 F.3d at 1354. Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record. *See id.* at 1355–56. Therefore, in reviewing cross-motions for judgment on the administrative record, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *Jordan Pond Co., LLC v. United States*, 115 Fed. Cl. 623, 630 (2014) (citing *Bannum, Inc.*, 404 F.3d at 1356–57). Put differently, "in a bid protest, the court reviews the agency's procurement decision to determine whether it is supported by the administrative record." *PAE Applied Techs., LLC v. United States*, 154 Fed. Cl. 490, 504 (2021). Accordingly, a party moving for judgment on the administrative record must direct the Court to the portions of the administrative record supporting its position. *See* RCFC 52.1(c)(1) (requiring a movant to "include in its motion . . . a statement of facts that draws upon and cites to the portions of the administrative record that bear on the issues presented to the court"); *Facility Healthcare Servs., Inc. v. United States*, 158 Fed. Cl. 254, 258 (2022) ("[I]t is not the Court's responsibility to scour the [extensive] administrative record in search of evidence that may or may not exist to advance Plaintiff's case." (citing *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991))).

## B. Analysis

Parties in a bid protest cannot meet their burden to show that an agency's award was irrational by throwing "mountains of evidence" at the Court and asking it to "play arch[a]eologist with the record." *Parus Holdings, Inc. v. Google LLC*, 70 F.4th 1365, 1371–72 (Fed. Cir. 2023) (alteration in original) (internal quotation marks omitted) (quoting *Gen. Access Sols., Ltd. v. Sprint Spectrum L.P.*, 811 F. App'x 654, 657 (Fed. Cir. 2020)); *see also Edmonds-Radford v. Southwest Airlines Co.*, 17 F.4th 975, 986 n.4 (10th Cir. 2021) ("It is not the role of this Court to engage in a scavenger hunt through the [extensive] record to piece together [Plaintiff's] arguments for her."). Here, instead of mountains of evidence, Plaintiffs offered the Court a mountain of arguments to wade through. In fact, between the two Plaintiffs, the Court was forced to grapple with a total of seventeen arguments in Plaintiffs' briefing. *See* ECF No. 40-1 at i; ECF No. 42-2 at ii–iii. None of these arguments, however, were effective, and most—likely due to the sheer number of arguments—were nowhere close to being sufficiently developed to reach Plaintiffs' burden of proof. Indeed, when the Court, at oral argument, instructed each Plaintiff to offer its three strongest arguments, neither Plaintiff hit that number, revealing how truly weak most of their arguments were. Oral Argument Recording at 1:37.

The Court continues to hope that its opinions will serve as a warning to bid protest litigants that carefully selecting and fully developing a few key arguments is a much better strategy than throwing half-developed arguments at the wall to see which one sticks. As the undersigned recently emphasized in *Scale AI*, "the strongest briefs seldom contain the greatest number of arguments but rather exemplify restraint by selecting and developing the arguments most likely to prevail." 182 Fed. Cl. at 529. Or as Judge Easterbrook observed: a brief advancing too many arguments "sends the message that counsel does not think much of any of the claims raised—or perhaps does not believe the court able to separate good arguments from bad." *Max M. v. New Trier High Sch. Dist. No. 203*, 859 F.2d 1297, 1300 (7th Cir. 1988). At some point, litigants may take heed of these points. In the meantime, despite their sheer volume, the Court will address each Plaintiff's arguments in turn.

### 1. LQTC Failed to Show that the Award to Optum was Irrational.

LQTC argues that the agency's evaluation of both its Past Performance and Technical proposals was unreasonable. ECF No. 42-2 at 10, 18, 25. It contends that the agency erred in its Past Performance assessment by assigning LQTC a Satisfactory Confidence rating. *Id.* at 10. Moreover, LQTC posits that the agency erred in its evaluation of Optum and LQTC by (1) irrationally assigning Optum certain strengths, (2) disparately evaluating the two offerors, and (3) failing to assign LQTC certain strengths. *Id.* at 28–38. As explained below, its challenges to both the Past Performance and Technical evaluations fail.

#### a. LQTC failed to show that the SSA's Past Performance rating lacked a rational basis.

The Court first turns to LQTC's challenge to its Satisfactory Confidence rating for Past Performance. LQTC contends that the SSA "failed to reasonably consider the context of the LOCs and Cure Notice LQTC received under the RHRP-3 contract." ECF No. 42-2 at 13; *see*

Tab 183 at AR 4023–24. Thus, LQTC argues that the past performance rating was irrational. ECF No. 42-2 at 10–11. To successfully challenge an SSA's past performance evaluation, "a protestor must identify 'hard facts'" that support its assertion that a CO's determination was in error. *See Agile-Bot II, LLC v. United States*, 156 Fed. Cl. 180, 207 (2021) (quoting *PAI Corp. v. United States*, 614 F.3d 1347, 1352 (Fed. Cir. 2010)). LQTC does not do so. Instead, LQTC attempts to reframe the facts surrounding the LOCs and the cure notice and attack this new set of "facts" in a vain attempt to gloss over the numerous concerns the agency had regarding LQTC's past performance. This attempt to create new, more favorable facts and then argue against these "facts" is not enough to meet LQTC's heavy burden of showing that the SSA's past performance evaluation was irrational. Instead of "hard facts," LQTC offers facts that turn out to be quite flimsy. Indeed, it is as if LQTC expected the Court to simply look at the selective passages LQTC quoted in its MJAR and not examine the administrative record any further to give these passages context.

LQTC's first salvo was to argue that the LOCs and the cure notice stem from "relatively early performance issues . . . . ar[rising] during the one-time transition from manual to automated processes to which the Government's own failures contributed." ECF No. 62 at 1–4. This argument fails for at least two reasons. One, blaming the agency for LQTC's performance issues does not inspire confidence that LQTC understands the import of its previous errors to agency evaluators. Two, and more importantly, the premise of LQTC's argument—that these were early or transition performance issues—is patently false. LQTC's period of performance on RHRP-3 began October 6, 2020. Tab 284 at AR 7267. After a lengthy ramp-up period that included multiple stop-work orders, LQTC began performance on June 1, 2023. Tab 304c at AR 7393. The LOCs and the cure notice were issued between March 2022 and August 2024, meaning LQTC's performance issues required formal intervention nearly four years after it began performance and more than a year after it assumed full responsibility for the contract. *See id.*; Tab 283 at AR 7261. Granted, stop-work orders arose and delays occurred early in contract performance. Tab 304c at AR 7393. But LQTC still had many opportunities to remedy its myriad issues. *See id*. LQTC's contention that its issues arose only "relatively early" in its performance on the contract resonates only in Bizarro World.[2] ECF No. 62 at 1. Thus, LQTC's argument fails because it relies on imagined facts, not real ones supported by the administrative record. *See Agile-Bot II*, 156 Fed. Cl. at 207 (quoting *PAI Corp*, 614 F.3d at 1352) ("To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion is not enough." (cleaned up)).

Even if the performance issues only arose from the transition from RHRP-2 to RHRP-3 (which they did not), LQTC's second attempt to distort the facts to fit its narrative also fails. LQTC argues that the SSA failed to consider LQTC's responses to the LOCs. ECF No. 62 at 3. According to LQTC, if the SSA had considered LQTC's responses, the SSA would have learned that (1) LQTC's performance issues were the government's fault, and (2) the issues "had been corrected or were unlikely to recur." *Id.* at 4. LQTC then proceeds to provide examples of its responses to the LOCs that purport to explain away its performance issues. *See id.* at 3–5. But

[2] "Like Bizarro Superman. Superman's exact opposite, who lives in the backwards bizarro world. Up is down; down is up. He says 'Hello' when he leaves, 'Goodbye' when he arrives." SEINFELD: *The Bizarro Jerry* (NBC television broadcast, aired October 3, 1996).

the examples LQTC provides do not respond to the plethora of performance issues that the LOCs identified. In fact, the government's reply brief identified at least seventeen issues arising in the LOCs that LQTC simply pretends do not exist. *See* ECF No. 69 at 24–25. LQTC faced a Herculean burden to try to show why none of those issues could form a rational basis for the SSA to have concerns about LQTC's past performance. *See Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) ("[T]he disappointed bidder bears a heavy burden of showing that the award decision had no rational basis.'" (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)); *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008) ("[A plaintiff's] challenge to [a government's] procurement decision thus invokes 'highly deferential' rational basis review." (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000)). LQTC, however, does not even attempt to undertake that burden. Rather, LQTC only addresses a fraction of the issues identified in the LOCs and Cure Notice, thereby failing to show that it was irrational for the SSA to consider those documents when evaluating LQTC's past performance.

Even if, as LQTC insists, the problems identified in the LOCs and the cure notice were never to reoccur, the mere fact that the agency had to formally intervene on four separate occasions to correct LQTC's performance is itself a rational basis upon which the SSA could base its past performance evaluation. *See SDS Int'l v. United States*, 48 Fed. Cl. 742, 756 (2001) ("Even if the agency's interpretation of the facts giving rise to the perception of substandard prior performance is disputed by the contractor, the agency's evaluation will not be overturned as long as it is reasonable."). Indeed, the existence of interventions is exactly what concerned the SSA: "It gives me considerable pause that the Government was required to employ significant contract oversight/management interventions in order to get LQTC to improve its performance in several critical performance areas." Tab 183 at AR 4023–24. And this is a completely reasonable concern: the SSA would have "shirked its legal duties" if he disregarded LQTC's performance issues on RHRP-3. *See Bannum Inc. v. United States*, 91 Fed. Cl. 160, 171 (2009) (remarking that agency was obligated to consider offeror's default termination on past contract). LQTC failed to demonstrate that the SSA's past performance evaluation was irrational; therefore, the Court will not disturb it.

Before the Court turns to the rest of LQTC's arguments, it pauses to note that, at oral argument, the Court presented LQTC with the opportunity to raise its three strongest arguments in support of its position. Oral Argument Recording at 1:37. It chose to raise this past performance position as one of its strongest points. *Id.* at 3:39. That its strongest argument fell so short of its burden is telling about the quality of the rest of LQTC's scattershot arguments.

#### b. LQTC Failed to Show that the SSA's Technical Evaluation Lacked a Rational Basis.

LQTC next argues that the SSA's technical evaluations of LQTC and Optum were irrational. ECF No. 42-2 at 25. It disputes the SSA's decision to assign Optum strengths on its technical approach and, conversely, the SSA's decision not to assign LQTC additional strengths for its technical approach. *See generally* ECF No. 42-2 at 28–38. An agency's technical evaluation is subject to a "highly deferential standard of review." *Digiflight, Inc. v. United States*, 167 Fed. Cl. 158, 167 (2023). The Court is not a "second set of eyes for every technical

determination by an agency" and will only disturb the agency's determination if it lacks any rational basis. *Id.*; *see also Golden IT, LLC v. United States*, 177 Fed. Cl. 118, 138 (2025) ("[A]gency's assessment must only be rational for this Court to uphold it."). Indeed, an "offeror's mere disagreement" with the agency's assessment does not satisfy the APA standard applicable here. *See Digiflight*, 167 Fed. Cl. at 165 (quoting *United Enter. & Assocs. v. United States*, 70 Fed. Cl. 1, 26 (2006)).

LQTC fails to meet its burden. It quibbles with the agency for (1) giving Optum a strength for its AI capabilities; (2) assigning Optum a strength for its cost savings for group events; (3) purportedly disparately evaluating Optum and LQTC; and (4) failing to assign LQTC "at least 6 strengths." *See* ECF No. 42-2 at 28–31, 34. These arguments range from mere disagreement with agency evaluators to points that are so undeveloped as to cause the Court to wonder why LQTC even started down the path of making the argument in the first place. The Court addresses each argument in turn.

*i. LQTC failed to show that the agency lacked a rational basis for assigning Optum a strength under technical subfactor 1.*

LQTC argues that the agency irrationally assigned Optum a Strength under Subfactor 1 (Provider Network) based on Optum's proposal to use "artificial intelligence that employs a three-tiered approach to meeting provider shortages (emerging, potential, immediate)." Tab 183 at 4018. It posits that Optum's tool for accomplishing this task is not, in fact, artificial intelligence, so it was irrational for the agency to assign Optum a strength for its artificial intelligence capabilities. *See* ECF No. 42-2 at 28–29. This argument fails for two reasons.

First, LQTC's MJAR concedes that Optum's proposal purported to use "'Predictive Analytics' and 'Advanced modeling.'" *Id.* at 29 (first citing Tab 252a at AR 6658; and then citing Tab 182 at AR 3991). Under this backdrop, LQTC fails to show that the SSA lacked a rational basis to conclude that Optum's proposal included artificial intelligence capabilities, based on Optum's proposal stating that Optum would use "Predictive Analytics," "Predictive Adequacy Modeling," "predictive insights that drive proactive decision-making," and "combining [Quest Analytics Software] with proprietary capabilities." *See* Tab 252a at AR 6658. The RFP did not provide any specific definition or codewords that offerors were required to use when discussing the use of artificial intelligence. Therefore, given the terms of Optum's proposal, it was entirely reasonable for the SSA to conclude that Optum proposed to use artificial intelligence and to grant it a strength for doing so. *See Golden IT*, 177 Fed. Cl. at 138 (agency's technical evaluation "must only be rational for this Court to uphold it" when the Solicitation does not constrain the Agency's discretion); *see also* Tim Mucci, *What is predictive AI?*, IBM (last visited Oct. 6, 2026) ("Organizations use predictive AI to predict potential future outcomes, causation, risk exposure and more.").[3] Moreover, LQTC does not offer any real argument for why, given the use of such terms, it was irrational for the agency to conclude that Optum was proposing to use artificial intelligence.

[3] https://www.ibm.com/think/topics/predictive-ai.

Second, instead of offering a fully developed argument regarding Optum's use or nonuse of artificial intelligence, LQTC appears to base its argument on the incorrect identification of the artificial intelligence tool in Optum's proposal. Specifically, LQTC's argument confuses Optum's proposed use of "Quality Analytics Software" with the completely different "Quest Analytics Suite." ECF No. 67 at 13–14. Basing one's argument on the wrong software is no way to demonstrate that the agency acted irrationally. Moreover, its two-paragraph argument on this point is conclusory and relies only on *System Studies & Simulation, Inc. v. United States*, 152 Fed. Cl. 74, 91–92 (2020), for the proposition that it is "irrational for the Agency to assign a strength where '[t]he record shows no evidence of such [supposed benefits].'" ECF No. 42-2 at 29 (alterations in original). But given that LQTC does not even identify the correct tool that Optum proposes to use, it is, in fact, LQTC's argument that contains "no evidence" that the agency's strength rating of Optum under Subfactor 1 was irrational. LQTC clearly did not take enough time to research Optum's proposal or develop a coherent theory. The Court will not spend more time analyzing LQTC's argument than LQTC did in preparing it. This point is essentially waived for lack of any real development. *See Bedwell v. United States*, 181 Fed. Cl. 30, 42 (2026) (citing *SmartGene, Inc. v. Advanced Biological Lab'ys, SA*, 555 F. App'x 950, 954 (Fed. Cir. 2014)) ("[U]ndeveloped or skeletal arguments are deemed waived.").

*ii. LQTC failed to show that the agency lacked a rational basis for assigning Optum a strength under Subfactor 5.*

Next, LQTC attacks the agency's assigning Optum a strength under Subfactor 5 (Scenarios) for its "national agreements with air carriers that offer either a [redacted]% to [redacted]% discount or a point reward program and advanced booking to leverage the discounts available at 21 and seven days." ECF No. 42-2 at 30 (internal quotation marks omitted) (quoting Tab 182 at AR 3981). It claims that assigning this strength was irrational because the agency was not permitted to evaluate any cost savings created by an offeror's technical approach to Group Events as part of the technical evaluation. Instead, according to LQTC, any cost savings could only be considered under Factor 5—Price. ECF No. 42-2 at 30. LQTC is incorrect.

However, the Solicitation did not allow DHA to evaluate potential approaches to reducing reimbursable travel costs under Factor 5. Tab 31a at AR 451 (stating the evaluation of TEP excludes travel costs). Furthermore, nothing in the Solicitation prohibited DHA from considering potential cost savings while evaluating an offeror's technical approach. *See* Tab 31a at AR 444–48. In fact, the Solicitation required DHA to consider cost when evaluating technical proposals to make a risk assessment for each subfactor. *See* Tab 31a at 445 ("The consideration of risk assesses the degree to which an offeror's proposed approach to achieving the technical factor or subfactor may involve risk of . . . increased cost . . . ."). Additionally, when the government made this point in its cross-MJAR, LQTC failed to respond or rebut it. Thus, LQTC conceded and waived any contrary argument. *See* ECF No. 54 at 73; ECF No. 62 at 19–20; *Superior Waste Mgmt. LLC v. United States*, 169 Fed. Cl. 239, 296 (2024) ("A reply brief can waive an argument by failing to respond to the opposing party's counterarguments or new arguments raised in the response brief." (cleaned up) (quoting *Kyles v. Beaugard*, No. 15-cv-8895, 2023 WL 5277882, at *21 (N.D. Ill. Aug. 16, 2023))).

Moreover, even if the agency erred, LQTC also received a strength based on how its technical approach would reduce the overall cost of RHRP-4. *See* Tab 268 at AR 7110 (finding LQTC's proposal's shorter transition-in period to be a strength due to reduced costs); *see also* Tab 183 at AR 4008 ("LQTC should receive a strength for its short transition-in timeline, as completing the transition more quickly than required offers the likely advantages of lower costs and less disruption."). Therefore, LQTC cannot possibly show it was prejudiced by DHA's cost saving consideration of Optum due to the fact that it also benefitted from the same alleged error. *See ACI Techs., Inc. v. United States*, 161 Fed. Cl. 58, 69 n.3 (2022) (citing *Ascendant Servs., LLC v. United States*, 160 Fed. Cl. 275, 287 (2022)). And without prejudice, any error was harmless.

*iii. LQTC failed to show that the agency disparately evaluated Optum and LQTC.*[4]

LQTC continues to quibble with the SSA's technical evaluation by arguing that the SSA disparately evaluated Optum's and LQTC's proposals. ECF No. 42-2 at 31. To show disparate treatment, a protestor must show that an agency unreasonably downgraded its proposal for deficiencies that were "'substantively indistinguishable' or nearly identical from those contained in other proposals." *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (quoting *Enhanced Veterans Sols., Inc. v. United States*, 131 Fed. Cl. 565, 588 (2017)). This requires a protestor to demonstrate that two proposals contain "'*nearly identical provisions*" but received different evaluations. *Ascendant Servs., LLC*, 160 Fed. Cl. at 294 (quoting *Enhanced Veterans Sols.*, 131 Fed. Cl. at 588). LQTC fails to make this showing.

First, LQTC again points to the agency's evaluation of Optum's AI capabilities. In arguing this point, LQTC highlights *differences* between the proposals regarding AI to show disparate treatment, essentially defeating its own argument. *See* ECF No. 42-2 at 31–32. When attempting to show that LQTC's and Optum's proposals were substantively indistinguishable, LQTC repeatedly asserts that its AI capabilities are superior to Optum's capabilities. *Id.* at 31. It proceeds to detail the differences between the proposals, including that "unlike Optum, LQTC actually proposed AI-based network management and monitoring," and that the agency lacked a rational basis for assigning Optum a strength for a "non-existent aspect of its proposal and den[ied] LQTC a Strength despite its having proposed such an approach . . . ." *Id.* at 32. Here, LQTC's argument once again falls flat on its face. It recognizes the rule that proposals must be "substantively indistinguishable" for a disparate treatment claim to survive but then argues that its proposal contains provisions that are materially different from those in Optum's. *Id.* Thus, in the span of just two paragraphs, LQTC manages to defeat its own argument, because "it is not disparate treatment for the Agency to evaluate different proposals differently." *Allicent Tech., LLC v. United States*, 166 Fed. Cl. 77, 110 (2023). Rather than proving disparate treatment of substantively indistinguishable proposals, LQTC attempts to artfully demonstrate that its proposal was meaningfully different from Optum's regarding its AI capabilities. Therefore, by LQTC's own argument, the agency could not have disparately evaluated LQTC's and Optum's proposals.

---

[4] The Court addresses challenges to Optum's evaluation that were raised by both LQTC and LHP in subsequent sections.

Second, LQTC spends two paragraphs each in its MJAR attempting to argue that Optum's Scheduling Capability and Transition-in Plans are substantively indistinguishable. ECF No. 42-2 at 31–33. However, an agency wields "substantial discretion" in making technical determinations. *DevTech Sys., Inc. v. United States*, 176 Fed. Cl. 297, 313 (2025) (internal quotation marks omitted) (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)). The Court "will not second guess'" the discretionary choices an agency makes in its technical evaluation. *Id.* at 315 (quoting *E.W. Bliss Co.*, 77 F.3d at 449). Offering just two paragraphs of argument on each subfactor to overcome this discretion is a bold strategy. But not one that pays off for LQTC. *Cf.* DODGEBALL: A TRUE UNDERDOG STORY (20th Century Fox 2004) ("It's a bold strategy, Cotton. Let's see if it pays off for 'em.").

Regarding Subfactor 2 (Scheduling Capability), LQTC contests the agency decision assigning Optum a strength for "the functionality and look, touch, and feel of Optum's proposed end-to-end SM scheduling experience . . . ." ECF No. 42-2 at 32 (cleaned up). According to LQTC, the agency should have assigned it a strength as well for its "step-by-step guide" to scheduling, its mobile scheduling capabilities, and its "fully integrated, mobile-friendly, end-to-end appointment management solution that enhances efficiency, accuracy, and Service Member experience." *Id.* But LQTC overlooks an important point: the agency found the "look, touch, and feel" of Optum's interface to be a strength, Tab 182 at AR 3979, but made no such assessment of LQTC's product. *Id.* at AR 3965. Preferring the "look, touch, and feel" of a scheduling interface is quintessentially a discretionary choice best left to the agency. While LQTC's interface may be similar, that fact alone does not mean it was owed a strength. *Cf. AccelGov, LLC v. United States*, 164 Fed. Cl. 345, 364 (2023) (rejecting claim of disparate treatment in the assignment of a strength where, although the proposals were "similar in some respects," the awardee's proposal provided more detail in its discussion). And the Court declines to second-guess the agency's preference for the "look, touch, and feel" of Optum's scheduling interface without a more developed argument from LQTC. To do so would be to dive into the "minutiae" of the technical evaluation, which the Court may not do. *See Ascendant Servs.*, 160 Fed. Cl. at 294 (internal quotation marks omitted) (quoting *Enhanced Veterans Sols.*, 131 Fed. Cl. at 588). Thus, LQTC fails to show disparate treatment on Subfactor 2.

LQTC's argument on Subfactor 4 (Transition-In Plan) fares no better. There, LQTC posits that it, like Optum, should have been assigned a strength for its proposed transition-in process "based on its StarTT® methodology, that ensures the processes and procedures used during transition have rigorous quality control and enhanced efficiency." ECF No. 42-2 at 33. Optum received a strength because its transition-in process was ISO 9001:2015 certified, meaning it met an "international process standard" for its transition-in proposed approach. Tab 182 at 3980. LQTC, on the other hand, asserts that its transition-in process ensures "rigorous quality control and enhanced efficiency." ECF No. 42-2 at 33. Very well. But it does not maintain that it, like Optum, holds an internationally recognized certification for its transition-in process. This material difference between the proposals renders them not "substantively indistinguishable" from each other.

Moreover, LQTC claims that it deserves a strength for its approach to identifying transition-in risks because Optum received a strength for its approach, which LQTC asserts is substantively indistinguishable. ECF No. 42-2 at 33. Do not ask why, though—LQTC did not

provide the Court with an answer. To show that its proposal was substantively indistinguishable, LQTC maintains that it, too, "detailed its approach to identifying transition-in risks and corresponding mitigation strategies" and that the agency observed that LQTC's approach was thorough. *Id.* In other words, LQTC thinks it deserves a strength under Subfactor 5 because it also had a plan. For one, this does not meet the "substantively indistinguishable" standard, which, at the risk of belaboring the point, requires nearly identical proposals. *Ascendant Servs.*, 160 Fed. Cl. at 294. And second, if this rationale succeeded, agencies would be forced to give proposals strengths simply for having a plan. Offerors cannot be rewarded simply for meeting expectations. LQTC fails to show disparate treatment on Factor 5.

*iv. LQTC failed to show that the agency irrationally failed to assign it several strengths.*

In LQTC's final Hail Mary challenge to its technical evaluation, it contends that the agency irrationally failed to assign LQTC several strengths. ECF No. 42-2 at 34. However, LQTC failed to show that it had been prejudiced by any of the agency's purported errors. *See Glenn Def. Marine*, 720 F.3d at 908 ("Ultimately, to prevail in a bid protest, the protestor must show prejudicial error."). And when the government raised this defect in its cross-MJAR, LQTC failed to contest that it had not alleged prejudice in its MJAR. *See* ECF No. 54 at 82; ECF No. 62 at 23–24. "A party's failure to raise an argument in an opening or responsive brief constitutes waiver." *Superior Waste Mgmt.*, 169 Fed. Cl. at 297 (internal quotation marks omitted) (quoting *Sarro & Assocs., Inc. v. United States*, 152 Fed. Cl. 44, 58–59 (2021)). Thus, LQTC's argument fails because it waived any contention that it was prejudiced by the errors it alleges.

For all the above reasons, LQTC has failed to show that the agency's evaluation of its proposal was in error. The Court turns next to LHP's protest.

**2. Like LQTC, LHP Failed to Show that the Award was Irrational.**

Generally, LHP argues that the agency erred in (1) engaging in misleading discussions with LHP regarding its price and its Past Performance rating, (2) assigning LHP a Neutral Confidence rating for its Past Performance proposal, and (3) irrationally evaluating its and Optum's Technical proposals. ECF No. 40-1 at 12, 16, 28. Like LQTC, its challenges to the agency's award decision fail.

**a. LHP failed to show that the agency's discussions were misleading.**

LHP first argues that the agency conducted unequal and misleading discussions with LHP. *Id.* at 12. It claims that the agency did so by (1) telling LHP that its price was "slightly above average," when, according to LHP, the price difference was more than slight; and (2) not telling LHP that it rated one of LHP's past performance references as Not Relevant. *Id.* at 12–13. When an agency conducts discussions, "those discussions must be 'meaningful' and not misleading." *Ginn Grp., Inc. v. United States*, 159 Fed. Cl. 593, 608 (2022) (quoting *CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698, 715 (2011)). Discussions are meant to raise shortcomings in a proposal "as judged from the standpoint of the government's stated needs, rather than from the standpoint of the proposal's relative competitiveness.'" *D & S*

*Consultants, Inc. v. United States*, 101 Fed. Cl. 23, 40 (2011), *aff'd*, 484 F. App'x 558 (Fed. Cir. 2012) (quoting *Structural Assocs., Inc. v. United States*, 89 Fed. Cl. 735, 743 (2009)). Therefore, discussions are misleading when an agency leads an offeror to respond to discussions "in a manner that does not address the agency's concerns[,] or that misinforms the offeror concerning its proposal weaknesses or deficiencies." *CSC Gov't Sols. LLC v. United States*, 129 Fed. Cl. 416, 437 (2016) (quoting *D & S Consultants*, 101 Fed. Cl. at 40–41). As is explained below, neither of LHP's arguments succeed in demonstrating that the agency misled LHP. Moreover, LHP fails to show that it was prejudiced by the agency's purported misleading discussions.

*i. LHP failed to show that the agency misled it by describing its price as "slightly above average."*

LHP first argues that the agency conducted misleading and unequal discussions when it informed LHP that its price was "slightly above" the average of the four offers prior to its submission of its FPR. ECF No. 40-1 at 12. LHP claims that the over $88M difference between its price and the average of the offerors' prices was greater than "slight," and thus the agency misled LHP by calling the price difference "slight." *Id.* Moreover, LHP claims the agency's statement prompted LHP to adjust its price "only slightly," reducing it by approximately $13M or about 1 percent. *Id.* This, it argues, made LHP's price uncompetitive, and led to LHP losing the bid. *Id.* at 12–13.

The foundation of LHP's argument is that a difference of $88 million can never be considered slight, even in the context of a ten-figure procurement where $88 million constitutes approximately seven percent of the total quoted price. *See* ECF No. 61 at 7. But as the Court raised at oral argument, a real-world example is helpful to illustrate why LHP is wrong. *See* Oral Argument Recording at 3:13:38. Consider a Black Friday deal on a new surfboard. If Firewire Surfboards offered a discount of just a seven percent on the boards it had in inventory, one probably would not consider that a doorbuster deal worth camping out for. Indeed, such a discount would be far below the average Black Friday discount at major retailers. *See* Seychelle Thomas, *Black Friday Discounts: Retailers with the Best Deals*, KIPLINGER (Nov. 29, 2024) (concluding average Black Friday 2024 discount was 38 percent).[5] Yes, saving seven percent is certainly better than paying full price, but it is only slightly a deal. And that "slightness" does not change if it is saving 70 cents on a $10 twelve pack of Coca-Cola; $70 on $1,000 surfboard; $7,000 on a $100,000 car; or $88 million on an over $1 billion procurement. LHP cannot in good conscience believe that a difference of $88 million cannot be considered "slight" given the size of the procurement at issue. For example, in June, the Department of War awarded a contract to Lockheed Martin for production of missile defense systems. *Contracts for June 24, 2026*, U.S. DEP'T OF WAR (last visited Oct. 6, 2026).[6] That contract is valued at over $35 billion. *Id.* In no world could an $88 million difference on that contract be considered anything other

---

[5] https://www.kiplinger.com/personal-finance/shopping/black-friday-discounts-retailers-with-the-best-deals.

[6] https://www.war.gov/News/Contracts/Contract/Article/4525817/contracts-for-june-24-2026/.

than slight.[7] And if there was any doubt, judges of this Court has specifically referred to a $100 million price increase as "slight" and refused to find irrational an agency characterization of an 8.3 percent price difference as "slight" or "minor." *Golden Mfg. Co. v. United States*, 107 Fed. Cl. 264, 278 (2012) (citing *AT&T Commc'ns, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1204, 1208 (Fed. Cir. 1993); *Sotera Def. Sols., Inc. v. United States*, 118 Fed. Cl. 237, 263 (2014). Thus, LHP's assertion that $88 million can never be slight is misguided, if not disingenuous.

LHP counters that DHA itself did not think $88 million was "slight," and cites to an internal PET report to support its point. ECF No. 61 at 7 (citing Tab 262 at AR 7052). In the report, the agency observed that "Optum's proposal demonstrates a significantly lower TEP than the IGCE and IE, at 6% below the modified IGCE and 24% below the IE. This substantial variance suggests a significantly lower cost structure or different pricing strategy/approach as compared to the other offerors and the government's estimates." Tab 262 at AR 7052. The agency also stated that "Optum's TEP is well below both the IDCE and IC and is also well below (13%) the average of the competitively offered prices." *Id.* LHP argues that this "definitively" proves that the agency believed that LHP's $88 million price difference was not slight; therefore, the agency misled LHP when it told LHP that it was only "slightly above average." ECF No. 61 at 7–8. But "definitively" is not the term the Court would have chosen, as LHP's reliance on these cherry-picked quotes is misguided.

First, when the PET noted that "Optum's proposal demonstrates a significantly lower TEP than the IGCE and IE," it is unclear whether the agency is describing Optum's price as significantly lower than the IGCE, the IE, or both. *See* Tab 262 at 7052. After all, Optum's price was 24 percent below the IE and a more modest six percent below the IGCE. *Id.* The PET may have assessed that Optum's price was lower than the estimates generally, rather than either the IGCE or IE individually.[8] In other words, the statement that LHP relies on is ambiguous. Thus, LHP's position that there was no doubt that the agency thought 7 percent to be "significant," not "slight," is not as ironclad as it thinks. Moreover, the agency, in making its competitive range determination, observed that none of the offerors were "excluded from the competitive range because all proposals are very competitively priced, within a very close range to the IGCE, and closely priced when compared to each other." Tab 179 at AR 3778. Those comments hardly reflect an agency that believed that there was more than a slight variation in price between offerors.

But even if the agency believed that seven percent was a "significant" or "substantial" difference, LHP had no way of knowing that fact upon learning that its price was "slightly above average" during discussions. The internal records LHP relies on for its position were not available to it at the time of discussions. Therefore, LHP's argument relies on a false premise—that LHP would have adjusted its prices directly in reaction to the agency's assignment of

---

[7] A difference of $88 million on that contract would be a .0025 percent difference. "Slight" would seem to be a more than appropriate characterization.

[8] LHP does not address the subsequent statement, where the PET referred to Optum's price as "well below" the IGCE, IC, and the average of the offerors TEPs. Tab 262 at 7052. Given that Plaintiffs (mercifully) did not try to parse where "well below" lies on the slightly-significantly matrix, the Court will not do so either.

percentages to the words "slight," "significant," or "substantial." Indeed, LHP had no way of knowing what the agency thought these descriptors meant (or if they had specific definitions at all). Truly, LHP's reaction to the discussion with the agency was a matter of independent business judgment. *See Lyon Shipyard Inc. v. United States*, 113 Fed. Cl. 347, 357 (2013) ("Simply put, [offeror] made a business decision not to adjust its price and should not be heard to complain now when that decision led to the loss of the contracting opportunity . . . .").

Indeed, a more likely scenario would involve the agency misleading LHP by using the word "significantly" to describe the relationship of LHP's price to the average. By LHP's logic, "significantly" could mean anywhere between six and twenty-four percent. As an example, assume that the agency had used the term "significantly" in its discussions with LHP, and LHP drastically lowered its price by cutting necessary services. This scenario more plausibly involves LHP being "misinformed" concerning its price, given that it was competitively priced to begin with. And if the agency misled LHP in this manner and LHP cut costs by weakening its technical proposal, LHP would likely be here protesting that no one would consider a seven percent difference in price "significant."

But even assuming a seven percent price difference is significant, LHP does not prove in support of its MJAR that it could have significantly reduced its price. It asserts that it would have significantly reduced its price if the agency had told it that the price difference was "significant" or "substantial." ECF No. 40-1 at 12–13. A party asserting that it would have changed its prices must state "what, specifically, it would have modified" and provide more than "vague references to pricing changes." *Kropp Holdings, Inc. v. United States*, 176 Fed. Cl. 512, 542 (2025), *reconsideration denied*, 180 Fed. Cl. 233 (2026), *appeal docketed*, No. 26-1504 (Fed. Cir. Mar. 10, 2026). Even assuming the agency misled LHP by using the term "slightly," LHP only offers a declaration asserting that it would have reduced its prices "significantly" by "incorporating future savings derived from the introduction of new technology and the use of the [redacted]" to allow "potential cost savings through a reduction in the staff required to perform group event activities," and by "the introduction of LHP's proposed self-service medical readiness capabilities." ECF No. 61 at 11 (quoting ECF No. 38-1 at 4–5). For at least two reasons, this assertion does not show that LHP was prejudiced by the agency's purported error. *See Golden IT*, 177 Fed. Cl. at 132 ("A plaintiff must do more than show *some* agency error; the plaintiff must also demonstrate that an agency's error was prejudicial.")

First, these supposed additional cost savings are already incorporated into LHP's price proposals. *See* Tab 192a at AR 4423–24. LHP, therefore, appears to claim it could reduce its price based on savings it has already incorporated into its price. This does not satisfy LHP's burden of showing how—specifically—it would have reduced its price. *See Kropp*, 176 Fed. Cl. at 542.

Second, the SSA found that LHP's advantage over Optum in Technical/Risk did not overcome either Optum's advantage in past performance or Optum's lower price. *See* Tab 183 at AR 4041–42. As a result, to have a "substantial chance" of receiving the reward, LHP would have had to reduce its price to beat (if not significantly beat) Optum's. *See REV, LLC*, 91 F.4th at 1163. LHP maintains that it could have reduced its prices accordingly, if only the agency had not said "slightly." ECF No. 38-1 at 5. But LHP fails to provide concrete, specific evidence of the

savings it would have incorporated—beyond those already incorporated into the proposal—that would reduce its price to meet even the average of the offerors, let alone the $213,500,570.54 difference from Optum's price. *See* Tab 183 at 4041. This vague reference to a possible price change is too speculative to show that LHP was prejudiced. *See Bannum*, 404 F.3d at 1358 (holding protestor's "conjecture" and showing of "numerical possibility" does not meet "substantial chance" standard). Accordingly, even if the agency erred in using the word "slightly" in discussions—which it did not—LHP has not shown that it was prejudiced by the alleged error. Thus, its argument on this point fails.

*ii. LHP failed to show that the agency engaged in misleading or unequal discussions by not discussing LHP's not relevant past performance reference.*

LHP next argues that, in discussions, the agency "improperly and disparately failed to raise past performance relevancy concerns with LHP." ECF No. 40-1 at 13. According to LHP, the agency—in its initial evaluation—assigned LHP a Limited Confidence rating on its past performance, in part, because it rated LHP's Past Performance Reference No. 1 submission as Not Relevant. *Id.* In other words, LHP contends that, because the agency—based on a perceived lack of relevancy of the past performance reference—failed to notify LHP of its Limited Confidence rating, the agency acted in a manner that was contrary to law. *Id.* at 13–14. But LHP mischaracterizes the agency's determination.

The PPET never stated that its determination was based on a single Not Relevant rating. *See* Tab 178 at AR 3745–46. Rather, the PPET stated that LHP's "*references* did not provide the PPET a strong sense that LHP can successfully perform the RHRP-4 contract." *Id.* at AR 3745 (emphasis added). Additionally, the PPET specifically noted its concerns regarding references other than LHP's Not Relevant reference, including that the magnitude of other references was "quite small both geographically and in spend" compared to RHRP-4; LHP's "limited record of performance handling group events;" and that the references as a group "failed to demonstrate suitable experience . . . in three of the five complexity areas" for RHRP-4. *Id.* For example, the PPET noted that none of LHP's five references "speak to providing virtual health services or electronic scheduling, which are key elements of the RHRP-4 requirement." *Id.* at AR 3746. Indeed, even LHP explicitly argued that DHA based its overall Limited Confidence rating only "*in part*, on its determination that LHP's Past Performance Reference No. 1 submission was Not Relevant." ECF No. 40-1 at 13 (emphasis added). Therefore, DHA's confidence rating was not based solely on any one reference. Because the Agency's confidence rating was not based solely on the single Not Relevant rating, LHP cannot show that the agency misled LHP when it did not discuss the rating with LHP. *See Pac. Eng'g Inc. v. United States*, 178 Fed. Cl. 666, 681 (2025)) ("The contracting officer is not required to discuss every area where the proposal could be improved . . . . the scope and extent of discussions are a matter of contracting officer judgment." (cleaned up) (quoting FAR 15.306(d)(3))).

Here, the contracting officer wielded the discretion not to bring up every area where LHP's past performance proposal could be improved. Had the single Not Relevant rating truly been the only problematic element of LHP's past performance proposal, the contracting officer may have been required to raise it during discussions. But that was not the case. Thus, this is a

question of regulatory interpretation that the Court needs not to reach here.[9] For this reason alone, the agency did not mislead LHP by not raising the Not Relevant rating during discussions.

However, even if LHP was correct and it was misleading for the agency to fail to raise the Not Relevant rating with LHP during discussions, LHP does not show how this alleged error prejudiced it. In an attempt to show prejudice, LHP claims that it could have added a different subcontractor "and/or a number of other firms" in order to improve its past performance evaluation had it known about the agency's concerns with its Reference No. 1. *See* ECF No. 38-1 at 3–4. Still, this vague statement fails to show prejudice. LHP does not provide enough detail in its briefing or in its declaration to establish that, had the agency raised its past performance relevancy concerns as LHP desires, (1) it would have been able to provide the work of a *major* subcontractor[10]; (2) that such a subcontractor would have improved the Not Relevant rating LHP received on its Past Performance reference; (3) that an upgraded relevancy rating would have led to an upgraded Past Performance rating; and (4) that an upgraded Past Performance rating would have led to a more substantial chance of receiving the award than it already had. *See* ECF No. 38-1; *Bannum* 404 F.3d at 1353 ("To establish 'significant prejudice' [protestor] must show that there was a 'substantial chance' it would have received the contract award but for the [Agency's purported errors in evaluating past performance]." (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)). Without providing this level of detail, LHP cannot overcome the high deference the Court affords past performance evaluations. *See Ocean Ships, Inc. v. United States,* 115 Fed. Cl. 577, 590 (2014) ("Deference to procurement officials is especially pronounced in matters of Past Performance, and the court will not second-guess an agency's reasonable determination as to the relevance or weighting of an offeror's prior experience." (citing *Glenn Def. Marine*, 720 F. 3d at 909 n.6, 911)).

Finally, LHP argues that the agency's discussions were unequal because it issued an EN to [redacted] regarding its past performance but did not do the same for LHP. ECF No. 40-1 at 14–15. However, any concerns about potential unequal discussions with other disappointed bidders are irrelevant. Unequal discussions only constitute prejudicial error if the discussions favored the contract awardee. *Kerr Contractors, Inc. v. United States*, 89 Fed. Cl. 312, 331 (2009), *aff'd*, 374 F. App'x 979 (Fed. Cir. 2010) (no prejudice to disappointed bidder where agency gave more specific information to another unsuccessful offeror). Even if a protestor proves that a fellow disappointed bidder received superior information in discussions, it still fails to show prejudice as such discussions "cannot be construed as giving [the awardee] a comparative advantage over [the protestor]." *Id.* Simply put, discussions with LQTC or [redacted] cannot have competitively disadvantaged LHP. If the agency had issued a similar EN to Optum, perhaps LHP may have a better argument. But that is not the case here, and LHP's argument fails.

---

[9] Because the overall past performance rating was not based on a single Not Relevant rating, the Court need not reach the parties' dispute about whether the reasoning in *Q Integrated Companies, LLC v. United States*, 126 Fed. Cl. 124 (2016) should apply here. *See* ECF No. 69 at 10-11; ECF No. 61 at 12-13.

[10] Only the past performance information of a major subcontractor could be considered under the terms of the solicitation.

### b. LHP Fails to Show that the Agency Lacked a Rational Basis for Assigning a Neutral Confidence Rating for LHP's Past Performance.

LHP's next grievance with the agency arises from the agency assigning LHP a Neutral Confidence rating for Past Performance. LHP argues that the agency wrongly concluded that LHP's past performance record was too sparse to allow any performance confidence assessment. ECF No. 40-1 at 16. An agency's past performance evaluation only needs to be reasonable. *See Ocean Ships,* 115 Fed. Cl. at 590 (first citing *Glenn Def. Marine*, 720 F. 3d at 909 n.6, 911; and then citing *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 718 (2010), *abrogated on other grounds by Safeguard Base Operations., LLC v. United States*, 989 F.3d 1326, 1342 (Fed. Cir. 2021)) ("[T]he court will not second-guess an agency's reasonable determination as to the relevance or weighting of an offeror's prior experience."). Thus, LHP faces a steep burden to show that no rational basis exists for the Neutral Confidence rating on its past performance. *IAP World Servs., Inc. v. United States*, 152 Fed. Cl. 384, 397 (2021) ("A protestor must overcome a 'triple whammy of deference by demonstrating by a preponderance of the evidence that the agency lacked any rational basis' to assign a given past performance rating." (cleaned up) (quoting *Fluor Intercontinental, Inc. v. United States*, 147 Fed. Cl. 309, 329 (2020)). And an agency's rationale in assigning a past performance rating need only be readily discernible to be reasonable. *See Golden IT*, 177 Fed. Cl. at 131 ("[The Court] may not supply a reasoned basis for the agency's action that the agency itself has not given, [but it] will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." (internal quotation marks omitted) (quoting *Snyder v. McDonough*, 1 F.4th 996, 1005 (Fed. Cir. 2021))).

Here, LHP has not met its heavy burden. The agency evaluated LHP's past performance reasonably and gave a reasonably discernible rationale for its decision. LHP has not sufficiently shown otherwise. In fact, at each step of the past performance evaluation, the agency offered a discernible rationale for its assessments. The PPET noted that the "magnitude of the work" referenced for LHP's past performance "is quite small both geographically and in spend when compared to the significant RHRP-4 requirement for group events" and that LHP had a "limited record of performance handling group events." Tab 272 at AR 7203. The PPET, therefore, rationally concluded that LHP's past performance references did not "involve/demonstrate a performance record delivering services that are truly comparable to those that will be required under the RHRP-4 contract." *Id.* Moreover, the references did not "reflect a track record of performance operating the type of shipping and storage distribution network required to support the quantity and scale of group events (let alone many simultaneous group events) that will be required under the RHRP-4 contract." *Id.* Still more, the agency noted that LHP's experience with group events consisted of events that were "substantially smaller/less complex than the support that will be required for the group event requirement anticipated under this solicitation." *Id.* Based on its evaluation, the PPET assigned LHP a Limited Confidence rating. *Id.* at AR 7194. The SSAC concurred with the PPET, noting that LHP's record was "quite limited" outside of providing dental services. *See* Tab 182 at AR 3986.

The SSA, like the SSAC, agreed with the PPET's analysis. Tab 183 at AR 4026; *see* Tab 182 at AR 3986 (SSAC analysis). And, like the PPET and SSAC, the SSA noted LHP's record of past performance was "quite limited" outside of dental services. *See* Tab 183 at AR 4026 (SSA); Tab 182 at AR 3986 (SSAC); Tab 272 at AR 7203 (PPET). However, the SSA noted that

nothing in this "quite limited" record "suggests that [LHP's] performance was ever substandard" in its past performance references. Tab 183 at AR 4026. Accordingly, the SSA concluded that "LHP's past performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned." *Id.* Consequently, the SSA *upgraded* LHP's rating to Neutral Confidence. *Id.*

Nevertheless, LHP asserts that the SSA never sufficiently explained why a Neutral Confidence rating was appropriate. ECF No. 61 at 16. It argues that a Neutral Confidence rating could not be justified when the PPET, SSAC, and the SSA had agreed that LHP deserved three Somewhat Relevant ratings and one Very Relevant rating across four of its five past performance references. *Id.* at 16–17. The problem with LHP's argument, however, is that it places too much emphasis on the relevance assessments while ignoring LHP's lack of a record demonstrating the quality of LHP's past performance. The SSA considered both the relevance and the quality of LHP's past performance. *See* Tab 183 at AR 4025–26. And in considering both factors, the SSA determined that LHP's record was too sparse to assign LHP anything but a Neutral Confidence rating. *Id.* at AR 4026. This was rational. Consider the chart reflecting LHP's Past Performance Evaluation:

| LHP | Final Past Performance Ratings | | | | |
|---|---|---|---|---|---|
| | R1 | R2 | R3 | R4 | R5 |
| **Relevancy** | Not Relevant | Somewhat Relevant | Somewhat Relevant | Somewhat Relevant | Very Relevant |
| **Quality** | PPQ: Very Good<br>CPARS: 75D30122C13956: Satisfactory | PPQ: None<br>CPARS: 36C24822D0084 2022: Satisfactory<br>CPARS: 36C24822D0084 2023: Satisfactory | PPQ: Very Good | PPQ: Satisfactory<br>CPARS: TCC15HQC0004 (12/31/2020 - 12/30/2021) | PPQ: Very Good<br>CPARS: 36C79122C0004 (9/01/2022- 08/30/2023<br>CPARS: 36C79122C0004 ((9/01/2023- 08/30/2024) |
| **Confidence Rating** | **Neutral Confidence** | | | | |

*Id.* Compare that to the chart reflecting Optum's Past Performance evaluation:

| Optum | Final Past Performance Ratings | | | | |
|---|---|---|---|---|---|
| | R1 | R2 | R3 | R4 | R5 |
| Relevancy | Very Relevant | Somewhat Relevant | Somewhat Relevant | Somewhat Relevant | Somewhat Relevant |
| Quality | PPQ: Exceptional<br>CPARS HT001119D0002 (12/01/2018 - 11/30/2019) Satisfactory<br>CPARS HT001119D0002 (12/01/2019 - 11/29/2020) Exceptional<br>CPARS HT001119D0002 (12/01/2020 - 11/30/2021) Exceptional<br>CPARS HT001119D0002 (12/01/2021 - 11/30/2022) Exceptional<br>CPARS HT001119D0002 (12/01/2022 - 05/31/2023) Exceptional | PPQ: Very Good<br>CPARS 36C10X22D0006 (04/01/2022 - 09/30/2022) Satisfactory<br>CPARS 36C10X22D0006 (10/01/2022 - 09/30/2023) Exceptional<br>CPARS 36C10X22D0006 (10/01/2023 - 09/29/2024) Exceptional | PPQ: Very Good | PPQ: Very Good<br><br>CPARS 36C10X19D0004 (11/28/2019 - 09/30/2020)<br>CPARS 36C10X19D0004 (10/01/2020 - 09/30/2021)<br>CPARS 36C10X19D0004 (10/01/2021 - 09/30/2022)<br>CPARS 36C10X19D0004 (10/01/2022 - 09/30/2023)<br>CPARS 36C10X19D0004 (10/01/2023 - 09/29/2024) | PPQ: None<br>CPARS 36C79119D0006 (10/01/2019 - 09/30/2020) Satisfactory<br>CPARS 36C79119D0006 (10/01/2020 - 09/30/2021) Satisfactory<br>CPARS 36C79119D0006 (10/01/2021 - 09/30/2022) Satisfactory<br>CPARS 36C79119D0006 (10/01/2022 - 09/30/2023) Satisfactory |
| Confidence Rating | Substantial Confidence | | | | |

*Id.* at AR 4030. Setting aside the Not Relevant reference and without diving into the minutiae of these ratings, it was completely rational for the agency to conclude that, despite the relevance of LHP's past performance, the agency did not have enough information to assign a confidence rating above Neutral Confidence. Compared to Optum's record, even the untrained eye could reasonably conclude that Optum had a substantial record of quality past performance and that LHP's record did not reflect nearly the same extensive record regarding the quality of its past performance. Considering the deference owed to the agency's trained eye regarding past performance, LHP has failed to meet its burden to show that the SSA lacked a rational basis for assigning a Neutral Confidence rating.

Nonetheless, LHP keeps trying to hammer away at the agency's past performance evaluation. Next, it argues that the agency improperly assigned a Not Relevant rating to one of LHP's past performance references (Reference No. 1). ECF No. 40-1 at 20. This argument asks the Court to dive into the minutiae of the past performance evaluation, which it declines to do. *Glenn Def. Marine,* 720 F.3d at 911 (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)); *see also Tech. Innovation All. LLC v. United States*, 149 Fed. Cl. 105, 138 (2020) ("[T]he determination of whether a particular example of past performance is relevant involves an exercise of discretion that lies particularly within the expertise of the procuring agency."). "[T]he FAR entrusts the critical determination of 'what does or does not constitute "relevant" past performance to the SSA's considered discretion.'" *Linc Gov't Servs.*, 96 Fed. Cl. at 718 (quoting *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 539 (2010)); *see* FAR 15.305(a)(2)(ii) ("The source selection authority shall determine the relevance of similar past performance information."). The PPET considered several reasons why LHP's Reference No. 1 was not relevant and documented its rationale. *See* Tab 272 at 7194–95. LHP has failed to show that the agency's reasoning lacked a rational basis or was not readily discernible. *See Golden IT*, 177 Fed. Cl. at 131; *cf. Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 605 U.S. 168, 181 (2025) ("[T]he question of whether a particular report is detailed enough in a particular case itself requires the exercise of agency discretion—which should not be excessively second-

guessed by a court."). In the end, LHP merely disagrees with the rating it received. That is not enough to sustain a challenge to a past performance evaluation. *See Advanced Tech. Sys. Co. v. United States*, 177 Fed. Cl. 443, 465 (2025) (citing *Onésimus Def. LLC v. United States*, 173 Fed. Cl. 344, 354–56 (2024)) ("In the context of challenging an agency's past performance evaluation, mere disagreement with the agency's relevancy ratings cannot be the basis of a successful post-award challenge."). Accordingly, LHP fails to show that any aspect of the agency's past performance evaluation was irrational.

**c. LHP failed to show that the agency acted irrationally in its technical evaluation of LHP and Optum.**[11]

LHP claims that DHA "unreasonably overlooked a clear technical risk in Optum's proposal," pointing to Optum's stated assumption that only 5% of RHRP-4 services would be arranged via telephone, while the remaining 95% would be self-scheduled. ECF No. 40-1 at 28–29. LHP points to data in Optum's proposal regarding its past performance on the RHRP-2 bridge contract showing that in 2023 Optum fielded an average of 10,369 calls per week—equivalent, as LHP notes, to 539,188 calls per year—and supported 350,000 servicemembers with self-scheduling. *Id.* at 29. LHP claims that this shows that 60 percent of all RHRP scheduling is done via phone and asserts that this makes Optum's assumption of five percent telephone scheduling "unrealistically drastic," "extraordinary," and "unsupported." *Id.* at 29–30. LHP claims that this "likely also accounts for a significant portion of [Optum's] purported price savings," and asserts that such savings "are likely to evaporate." *Id.* at 30. At least two problems doom this argument.

First, LHP is flat-out wrong. Optum's proposal is clear that the price assumption regarding a 95% self-serve and a 5% call ratio related only to "schedul[ing] appointments." Tab 254d at AR 6998. In contrast, Optum's discussion of an "average of 10,369 calls per week" in its description of its prior performance on the RHRP-2 contract related to the total call volume for the week, not just calls to schedule appointments. Tab 254b at 6947. In fact, in the same discussion in Optum's proposal, Optum notes that it reached 350,000 service members through LHI.Care, its electronic scheduling platform. *Id.* Optum made clear distinctions in its proposal between its call volume and self-scheduling capabilities. LHP ignored those distinctions in attempting to make this argument.

Second, even if it had not made such a heedless error, LHP's contention that the call-volume assumption accounts for price savings in Optum's proposal is nothing more than a thinly veiled attempt to sneak a price realism argument into this protest under the guise of it being an issue with Optum's technical evaluation. However, the Solicitation did not obligate the agency to conduct a price realism analysis and, in fact, specifically noted that the agency would not conduct such an analysis. Tab 33.4 at AR 828. As the Court is sure LHP is aware, absent mandatory language requiring a price realism analysis, the Court will not read such a requirement into the solicitation. *See Scale AI, Inc.,* 182 Fed. Cl. at 550 (citing *Ala. Aircraft*

---

[11] As noted above, the Court addresses challenges to Optum's evaluation raised by both LQTC and LHP in subsequent sections.

*Indus.*, 586 F.3d at 1375–76). Therefore, the Court rejects this misguided argument. The Court turns next to Plaintiffs' shared qualms with the agency's evaluation.

### 3. Both Plaintiffs Failed to Show that the Agency Lacked a Rational Basis for Assigning Optum's RHRP-2 Reference a Very Relevant Rating.

Plaintiffs both argue that the agency irrationally assigned a Very Relevant rating to Optum's RHRP-2 reference in its Past Performance proposal. ECF No. 42-2 at 19; ECF No. 40-1 at 2. They both claim that the agency's evaluation was irrational because it concluded that Optum's work on the RHRP-2 Bridge contract was Very Relevant based on "numerous unsupported statements" that constitute a "complete lack of analysis." ECF No. 42-2 at 19; *see also* ECF No. 40-1 at 2 ("Indeed, besides a conclusory statement that the RHRP-2 Bridge contract 'includes all the complexities,' there is no evidence the Agency even assessed the relevancy of the RHRP-2 Bridge."). As the Court has repeated above, past performance ratings are subject to significant deference. Moreover, an agency need not explain every detail that factored into an evaluation—it need only provide a rationale that is "'reasonably discernible.'" *See DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1315 (Fed. Cir. 2021) (quoting *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998)); *see also Seven Cnty. Infrastructure*, 605 U.S. at 181 ("[T]he question of whether a particular report is detailed enough in a particular case itself requires the exercise of agency discretion—which should not be excessively second-guessed by a court."); *DigiFlight*, 167 Fed. Cl. at 166) ("[D]isappointed bidders always believe that 'a more detailed analysis should have been documented,' but as the Court has noted that is not 'the issue for the Court to decide.'" (quoting *Sirius Fed., LLC v. United States*, 153 Fed. Cl. 410, 423 (2021))). Plaintiffs again fail to overcome this burden.

Plaintiffs fixate on the agency's purported lack of explanation for assigning Optum a Very Relevant Past Performance rating based on its RHRP-2 reference. But consider the PPET's evaluation of the RHRP-2 contract:

> The work performed under this umbrella IDIQ and the associated series of task orders is essentially the **same in scope and complexity, and similar in magnitude** as the work required in this solicitation. As noted, this reference was for the RHRP-2 bridge contract between RHRP-2 and RHRP-3. As such, the contractor provided all types of medical and dental readiness services in the 50 states and the District of Columbia, the Commonwealths of Puerto Rico, and the Northern Mariana Islands, the territories of American Samoa, Guam, and the U.S. Virgin Islands. Although the PPQ states that the IDIQ awarded value was $758,435,881.67, the offeror's Vol IV states that the total value of all task orders across the five-year PoP is $579,092,972.99, making the annual spend average $115,818,595, which is slightly less than the RHRP-4 requirement (as defined in the solicitation's "Relevancy Evaluation Considerations" table). This contract includes all the complexities, and close to the expected volume of services associated with the RHRP-4 requirement. Therefore, considering the substantial similarity between the RHRP-2 Bridge work and the RHRP-4 requirements, the PPET rated R1 as **very relevant**.

Tab 317 at AR 7468. And consider the SSA's reasoning to reach his conclusion on Optum's past performance evaluation:

> I reviewed the discussion in the PER and the SSAC report regarding the assessment of Optum's past performance record. The PPET reviewed five reference contracts submitted by Optum for its own performance. Optum provided PPQs for each reference, and the PPET also obtained CPARS reports to support the narratives provided in [Optum's references]. The PPET assessed that all the reference contracts were recent and assessed the relevancy of the contracts from Somewhat Relevant to Very Relevant. The Very Relevant reference was for Optum's work on the RHRP-2 bridge contract, which is essentially the same work that will be required under the RHRP-4 contract. I concur with the PPET's recency and relevancy findings . . . After a thorough and careful review of the entire past performance record, the PPET assigned a Past Performance rating of Substantial Confidence. The SSAC concurred with that rating. After consideration of the PPETs findings and observations, the SSAC's review, and my personal review of all materials provided, I concur with their findings.

Tab 183 at AR 4028–29. In addition, the SSA noted that where he "concurred and [had] not taken exception with particular evaluation findings, [he] accept[ed] these findings, conclusions, and the supporting rationale as [his] own and incorporate[d] them into this decision document." *Id.* at 4005. Plaintiffs fail to show why these explanations did not give a "readily discernible" basis for rating the RHRP-2 reference as Very Relevant. *See DynCorp,* 10 F.4th at 1315 (quoting *Wheatland*, 161 F.3d at 1369–70).

The SSA is the "final authority" in this procurement, and the FAR requires him to use his independent judgment in evaluating bids. *Wellpoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1379 (Fed. Cir. 2020). Yet he may, as he did, rely on the PPET's (and SSAC's) evaluations in reaching his conclusion, without redoing the same complete analysis. *See id.* (citing FAR § 15.308). Moreover, these conclusions are exercises in judgment "best left to the expertise and discretion of the agency," only to be disturbed if the protestor can show that the agency acted unreasonably. *XPO Logistics Worldwide Gov't Servs., LLC v. United States*, 134 Fed. Cl. 783, 802 (2017), *aff'd*, 713 F. App'x 1008 (Fed. Cir. 2018). Although Plaintiffs demand more detail, the SSA sufficiently explained his rationale and his decisional path is readily discernable. Where the SSA produced over forty pages of evaluation in making his final decision, the Court will not require him to explain himself further.

Besides the fact that the SSA's rationale was readily discernible, Plaintiffs also fail to demonstrate that the SSA's decision was unreasonable. The Court will not disturb a past performance evaluation that is reasonable. *See Red River Computer Co., Inc. v. United States*, 120 Fed. Cl. 227, 237 (2015) ("Given the broad discretion given to the agency in evaluating past performance, in the final analysis, the question is whether the assignment of a past performance rating was reasonable in light of the record and consistent with the stated evaluation criteria." (first citing *Todd Constr., L.P. v. United States*, 88 Fed. Cl. 235, 247 (2009); and then citing *E.W. Bliss Co.*, 77 F.3d at 449)). Indeed, when reviewing an agency's past performance rating, the Court affords the agency the "greatest deference possible . . . ." *FirstLine Transp. Sec., Inc. v.*

*United States*, 100 Fed. Cl. 359, 396 (2011) (quoting *Univ. Rsch. Co. v. United States*, 65 Fed. Cl. 500, 505 (2005)). To traverse this mountain of deference, Plaintiffs needed fulsome and detailed arguments supported by "'hard facts'" rather than a "mere inference or suspicion" that the SSA's determination was irrational. *Agile-Bot*, 156 Fed. Cl. at 207 (quoting *PAI Corp.*, 614 F.3d at 1352). But here, neither Plaintiff even made it to base camp.

The agency assigned Optum a Very Relevant rating because the work on the RHRP-2 contract was "essentially the same in scope and complexity, and similar in magnitude" vis-à-vis the RHRP-4 contract. Tab 181 at AR 3943. Although LQTC argues that the "Very Relevant" rating demanded essentially the same scope, essentially the same magnitude, and essentially the same complexity, the "only reasonable construction" of the Very Relevant rating "is that all three sub-factors must be considered together, as only that reading would permit the agency to assign each project a Relevance rating the Solicitation requires." *Frawner*, 161 Fed. Cl. at 447 (citing *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 381 (2003), *aff'd* 365 F.3d 1345 (Fed. Cir. 2004)). Considering all three subfactors together, it is entirely reasonable that the agency gave the work on the RHRP-2 contract a Very Relevant rating. Plaintiffs have not shown otherwise, nor did they even really attempt to in a meaningful manner in their briefing.

One example Plaintiffs offer to show that the agency's evaluation was irrational centers on the requirement in RHRP-4 for electronic scheduling. Specifically, Plaintiffs claim that unlike the RHRP-4 contract, "Optum's RHRP-2 contract did not involve the complexity of electronic scheduling . . . so it could not have involved 'essentially the same' complexities that come with setting up such a system." ECF No. 42-2 at 20–21; *see also* ECF No. 40-1 at 27 ("[T]he RHRP-4 contract contains numerous requirements related to electronic scheduling . . . that have no parallels in the RHRP-2 effort, which did not require a similar electronic scheduling capability."). Plaintiffs may be correct that the RHRP-2 contract did not require Optum to provide a platform for electronic scheduling, *but Optum did it anyway*:

> SMs were able to self-schedule in-clinic and virtual health services and enroll in eligible group events electronically via LHI.Care. SC personnel and our Medical Service Coordinators (MSCs) electronically scheduled via web or mobile for in-clinic, virtual, and group events. LHI.Care was used to support and engage with an average of 350,000 SMs per year to self-schedule, reducing administrative resources needed for appointment scheduling.

Tab 254b at AR 6947. In highlighting that Optum was not required to provide electronic scheduling services under RHRP-2 but did so anyway (apparently quite effectively), Plaintiffs bolster, rather than undermine, the agency's decision to give Optum a "Very Relevant" rating on its RHRP-2 reference.

Plaintiffs provide the Court a handful of other cherry-picked examples they maintain show that the agency "could not have concluded Optum's contract involved the 'same scope and complexity' as the Solicitation because there are multiple RHRP-4 requirements that were not part of the RHRP-2 contract." ECF No. 42-2 at 20; *see also* ECF No 40-1 at 27 ("Had the Agency performed more than a cursory evaluation of the RHRP-2 effort for relevancy, it would have identified substantial differences between the RHRP-2 effort and the RHRP-4 effort that

preclude a finding that they are 'essentially the same in scope and complexity.'"). Indeed, Plaintiffs demand that the agency perform a side-by-side analysis of the RHRP-2 and RHRP-4 contracts to identify each requirement variance across over 100 pages of technical requirements. But neither Plaintiff itself was willing (or able) to offer anywhere near the amount of evidence required to show that rating Optum's RHRP-2 experience as Very Relevant lacked any rational basis. Yet, that is exactly the type of showing that was required in order to demonstrate that the agency's conclusion was irrational.

Instead of doing the required work to demonstrate that there are "numerous requirements" that differ significantly from RHRP-2 to RHRP-4, LHP simply cites to the RHRP-2 solicitation and provides the Court with a hyperlink. *See* ECF No. 40-1 at 27. This approach left the Court to question, "surely, you can't be serious?" AIRPLANE! (Paramount Pictures 1980) ("Surely you can't be serious. . . . I am serious, and don't call me Shirley."). By simply citing the solicitation and expecting the Court to compare the two solicitations, LHP treats the Court like a pig, hunting for truffles. *See Pipes v. United States*, 123 F.4th 1324, 1331 (Fed Cir. 2024) ("[J]udges are not like pigs, hunting for truffles buried in briefs or the record." (quoting *Jones v. Kirchner*, 835 F.3d 74, 83 (D.C. Cir. 2016)), *cert denied,* 146 S. Ct. 190 (2025). LHP contends that the "PPET's conclusory 'assessment' that RHRP-2's complexities map to those for RHRP-4 prevents this Court from adjudicating the rationality of the Agency's determination." ECF No. 40-1 at 27–28. But it is LHP's and LQTC's undeveloped arguments that prevent the Court from adjudicating the correctness of their arguments. The fact that LHP claims there are "numerous other examples" of agency error without any further explanation shows how flimsy its argument truly is. *Id.* at 27.

For its part, LQTC cherry-picks several requirements that differ between the two contracts. One would think, however, that if LQTC were to select choice provisions that support its argument, it at least would highlight real, significant differences that show that performance on the RHRP-2 contract may not be relevant for the RHRP-4 contract. Not so. For example, LQTC attempts to show that the RHRP-2 contract did not involve the same complexities as the RHRP-4 contract because RHRP-4 requires the contractor to establish a provider network where service members must drive no further than forty miles to reach a provider. ECF No. 42-2 at 20–21. It was irrational for the Agency to assign Optum's RHRP-2 contract performance a "Very Relevant" rating, LQTC argues, because RHRP-2 requires a provider network driving distance of *fifty* miles, not forty. *Id.* Not only is this difference so slight that it renders the argument laughable, but LQTC attempted to hide what is even more damaging. LQTC is the incumbent for the RHRP-3 contract and received a "Very Relevant" rating for its performance on that contract. Tab 183 at AR 4021. The provider network driving distance for RHRP-3? Fifty miles. ECF. No. 42-5 at 9. So even if the agency erred in giving weight to Optum's performance on the RHRP-2 contract because of this radius issue, LQTC received the same weight on its performance of the RHRP-3 contract with the same radius. Tab 183 at AR 4021.

What is more, LQTC's argument that Optum must lose its Very Relevant rating for RHRP-2 "because there is no record [DHA] even considered ***any differences in complexity*** between the two contracts" is on unsound footing. *See* ECF No. 62 at 12. If LQTC is correct, then DHA's almost identical determination of Very Relevant for LQTC's RHRP-3 contract would have to suffer the same fate. *Compare* Tab 284 at AR 7267–68 (LQTC RHRP-3 evaluation) *with*

Tab 317 at AR 7468–69 (Optum RHRP-2 evaluation). Moreover, as stated previously, an error from which the complaining party also benefits is not prejudicial. *See ACI Techs.*, 161 Fed. Cl. at 69 n.3 (citing *Ascendant Servs.*, 160 Fed. Cl. at 287). Thus, even if the agency's evaluation was in error for lack of detail, LQTC benefitted from the same error. It can show no prejudice and, therefore, has not met its burden under the APA standard.

To conclude, none of Plaintiffs' attempts to show that the agency's evaluation of Optum's RHRP-2 performance was irrational meet their burden.

**4. Plaintiffs Fail to Show that the Agency Lacked a Rational Basis in Using the Terms "Higher- and Lower-Level" Strengths.**

Penultimately, Plaintiffs argue that the SSA's use of the terms "higher-level" and "lower-level" to describe certain strengths in the offerors' technical proposals was irrational because the terms do not appear in the solicitation. ECF No. 42-2 at 25; ECF No. 40-1 at 31; *see generally* Tab 183 (describing various strengths as "higher-level" or "lower-level"). But neither LQTC nor LHP addressed how the distinction between lower-level and higher-level strengths caused prejudice. Indeed, LQTC said the quiet part out loud: the SSA used these terms in the evaluation of every offeror's proposal. ECF No. 42-2 at 26. So in essence, Plaintiffs' argument is "you can't do that."

First, one can. It is called a tradeoff analysis. "Procurement law is clear that an agency may choose to attribute different weights to different strengths and weaknesses." *AccelGov, LLC v. United States*, 180 Fed. Cl. 385, 395 (2026) (internal quotation marks omitted) (quoting *Can Softtech, Inc. v. United States*, No. 24-670, 2024 WL 4434253, at *19 (Fed. Cl. Oct. 4, 2024); *cf. Unisys Corp. v. United States,* 89 Fed. Cl. 126, 143 (2009) ("[N]ot all weaknesses are equal."). Here, the SSA used the terms "higher-level" and "lower-level" to describe the weight he gave to the offerors' assigned strengths and weaknesses. This reflects a diligence and transparency that certainly makes the SSA's decision "readily discernible." *See DynCorp*, 10 F.4th at 1315 (quoting *Wheatland Tube*, 161 F.3d at 1369–70); *see also Seven Cnty. Infrastructure*, 605 U.S. at 181 ("[T]he question of whether a particular report is detailed enough in a particular case itself requires the exercise of agency discretion—which should not be excessively second-guessed by a court."). And LHP affirmatively conceded that the agency had the discretion to weigh strengths and weaknesses. *See* ECF No. 61 at 27 ("LHP has not, and does not, contest the SSA's discretion to reasonably differentiate among assigned strengths."). It was not irrational for the agency to use these descriptors, and LHP has conceded as such.

Even if it were error, however, the Court is forced to, once again, remind the parties that error alone is not enough to win a protest. The error must also be prejudicial. *See Glenn Def. Marine*, 720 F.3d at 908. To establish prejudice, a protestor "must show that there was a substantial chance it would have received the contract award but for the alleged error in the procurement process." *REV, LLC*, 91 F.4th at 1163 (internal citations and quotations omitted). While LHP has conceded the agency's discretion, LQTC did not argue prejudice on this point in its MJAR. *See* ECF No. 42-2 at 25–28. Thus, its argument does not even attempt to fully meet its burden of proof. Under these circumstances, the Court will not disturb the agency's discretion in weighing offerors' strengths and weaknesses.

**5. Plaintiffs Fail to Show that the SSA's Best Value Tradeoff Lacked a Rational Basis.**

Lastly, Plaintiffs argue that the SSA's best value tradeoff analysis was irrational. *See id.* at 38. A protester must demonstrate flaws in the rating process to show that an agency's best value tradeoff was irrational. *See Harmonia Holdings Group, LLC v. United States*, 166 Fed. Cl. 727, 740 (2023) ("[Protestor] has failed to show flaws in the rating process and therefore that the best-value determination was arbitrary and irrational."). As discussed above, Plaintiffs have not shown that the rating process was flawed. Thus, their arguments that the best value tradeoff was irrational necessarily fail.

For all the above reasons, Plaintiffs have failed to show that the agency's evaluation of their proposals was arbitrary or capricious.

## CONCLUSION

The "everything but the kitchen sink" approach to bid protest litigation rarely works. Here, Plaintiffs offered every argument they could, resulting in undeveloped arguments that failed to assert elementary points, waiving necessary arguments, and otherwise presenting unconvincing arguments. Had Plaintiffs focused their attention on developing just a few arguments, they may have stood a better chance of showing that DHA's award decision was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. Instead, Plaintiffs thew everything they could think of at the Court in hopes that something would stick. They came up empty.

Accordingly, LHP's and LQTC's motions for judgment on the administrative record are **DENIED**, their requests for injunctive relief are **DENIED**, and the government's and Optum's cross-motions for judgment on the administrative record are **GRANTED**. The Clerk shall enter **JUDGMENT** accordingly.

**IT IS SO ORDERED.**

s/ Zachary N. Somers
ZACHARY N. SOMERS
Judge